IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CLIVELLA D. SAMUELS           :

                               :

      v.                       :   Civil Action No. DKC 10-2480

                               :

TWO FARMS, INC.                :

                               :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination action is a motion for summary judgment filed by Defendant Two Farms, Inc. (ECF No. 23).[1]   The issues have been fully briefed, and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary.   For the reasons that follow, Defendant's motion will be granted in part and denied in part.

**I.   Background**

    **A.   Factual Background**

The following facts are presented in the light most favorable to Plaintiff Clivella D. Samuels, the nonmoving party.

Plaintiff, a Maryland resident, began working full-time at Defendant's Fleet Street store in Baltimore, Maryland in October

---

[1] Defendant trades under the name "Royal Farms Stores," and Plaintiff references Defendant by that name repeatedly in her papers.

2005.  (ECF No. 28-4, Samuels Dep., at 8; ECF No. 28-5, Samuels Decl., ¶ 1; ECF No. 28-8, Pl.'s Answers to Interrogs., at 2).[2] Plaintiff worked the store's "second shift," which lasted from 2:00 p.m. until 10:00 p.m., and her position involved working at the store's cash register and its deli, as well as stocking shelves and other non-managerial tasks.  (ECF No. 28-4, at 19; ECF No. 28-5 ¶ 11).  Plaintiff received a copy of Defendant's employee handbook, which discussed its sexual harassment policy and procedures, and Plaintiff acknowledged in writing that she had received the handbook.  (ECF 28-5 ¶¶ 4-5).  Defendant did not, however, require Plaintiff to read the handbook nor did it provide training related to sexual harassment at any time during Plaintiff's employment at the store.  (*Id.* ¶¶ 6-8).  From October 2005 until early July 2007, Plaintiff reported to Tony Corleone, the store's manager, who repeatedly told her that she "could work [her] way up to being a manager."  (ECF No. 28-4, at 19).  Shawn Stevenson reiterated this sentiment when he replaced Tony Corleone as store manager in early July 2007.  (*Id.* at 19-20).

_____

[2] Plaintiff's answers to Defendant's interrogatories do not contain page numbers.  Certain of the answers provided in that document are relevant to the resolution of the pending motion and span several pages.  For that reason, and for easy reference, the citations in this memorandum opinion to those answers will list the page number(s), as provided by the CM/ECF system, on which the relevant answer was given.

Stevenson generally worked from 6:00 a.m. until at least 4:00 p.m. because the store did not employ an assistant manager to supervise its second shift employees. (*Id.* at 21; ECF No. 28-7, Stevenson Dep., at 86-88). On or about July 10, 2007, Stevenson began making "unwanted" comments to Plaintiff about the way that her clothing fit over her breasts and her buttocks. (ECF No. 23-3, Samuels Dep., at 35; ECF No. 28-8, at 6). Plaintiff asked Stevenson to leave her alone. (ECF No. 28-8, at 6). Shortly thereafter, Stevenson started "glar[ing]" at Plaintiff's body and touching her. (*Id.* at 8-9). Stevenson first touched Plaintiff by grabbing her hand and leading her to a particular area of the store and by leaning in close to her and moving her hair. (ECF No. 28-4, at 33). Although Plaintiff "didn't really think [this interaction] was anything . . . at first," the second time Stevenson touched her, Plaintiff asked him why he continued to do so. (ECF No. 23-3, at 34). Around this time, Stevenson "drastically" reduced Plaintiff's working hours at the store. (ECF No. 28-4, at 37). In order to continue supporting both herself and her son, Plaintiff began working "once every other week" as an exotic dancer to offset the income that she lost as a result of her reduced schedule at the store. (*Id.* at 37-39).

In August 2007, Stevenson changed Plaintiff's work hours again and placed her on the schedule "four or five days a week." (*Id.* at 44). Stevenson continued making "rude sexual comments" about Plaintiff's breasts and buttocks and glaring at her body on a daily basis. (ECF No. 28-8, at 6). When Stephanie Muir, a store employee who was having a sexual relationship with Stevenson, told him that Plaintiff had obtained a part-time job as an exotic dancer, Stevenson's comments became "more frequent and more aggressive." (*Id.*; ECF No. 28-5 ¶ 27). In addition to continuing comments about her breasts and buttocks, Stevenson asked about Plaintiff's vagina, sex toys, masturbation, and oral sex when talking about her work as an exotic dancer and generally referred to women as "ghetto trash" and "bitches." (ECF No. 28-8, at 7-8; ECF No. 28-5 ¶ 30).[3] He also repeatedly asked if he would "have a good time" if he visited Plaintiff at the club where she danced. (ECF No. 28-8, at 7). Plaintiff

---

[3] Stevenson once asked Plaintiff about recruiting another store employee, Ann Thomas, to become an exotic dancer so that Stevenson could come to the dance club and "throw some money at her." (*Id.*). Stevenson repeatedly "acted and spoke in a way that conveyed to everyone that he wanted to have sex" with Thomas, and, in October 2007, Thomas wrote a letter to the company's management about Stevenson's inappropriate behavior. (ECF No. 28-10, Thomas Decl., ¶¶ 18, 25, 31, 44). According to Thomas, Stevenson fired her shortly before she wrote this letter because he feared that "he would get in trouble for sexually harassing [Plaintiff] and Thomas." (*Id.* ¶ 44).

became increasingly "forceful" in demanding that Stevenson cease making such comments, but to no avail. (*Id.* at 6). The comments continued, as did Stevenson's attempts to interact physically with Plaintiff. Stevenson used the store's video cameras to watch Plaintiff while she worked in the store, and he repeatedly touched her arms, shoulders, neck, and face – often after first isolating Plaintiff in the store's large walk-in refrigerator. (*Id.* at 8-9). During one of these encounters, Stevenson tried to kiss Plaintiff. (*Id.* at 9).[4] Plaintiff once again asked Stevenson to leave her alone (i*d.* at 6), but "the more upset that [Plaintiff] got" in responding to Stevenson's advances, "the more forcefully and flagrantly [he] harassed [her]" (ECF No. 28-5 ¶ 42).

In late August 2007, Stevenson gave Plaintiff a bad performance review that prevented her from receiving a pay raise, and Plaintiff "didn't want to talk to [Stevenson] as a result." (ECF No. 23-3, at 54; ECF No. 28-8, at 9). Stevenson nonetheless cornered Plaintiff in the walk-in refrigerator and "g[ot] really close" to her in an "intimate" manner. (ECF No.

---

[4] Stevenson would also respond "in a jealous" way when Plaintiff assisted male customers at the store. (*Id.* at 8-9). For instance, he would routinely approach male customers who spoke with Plaintiff and inform them that they could not talk to her. (ECF No. 23-3, at 58-59).

23-3, at 54, 75).  He then told her that she "need[ed] to stop being mean to [him]" and that he would give her a positive review if she would "stop being so mean to [him]."  (*Id.* at 75). Plaintiff once again demanded that Stevenson leave her alone, telling him to "[g]et out of [her] face."  (*Id.* at 55).  After this encounter, Plaintiff called Nick Wanga, Defendant's district manager, and left a message requesting to speak with Wanga about Stevenson's behavior at the store.  (ECF No. 28-8, at 9-10).  Wanga came to the store and arranged a meeting to discuss the situation with Plaintiff, but he "never showed up" for that meeting.  (*Id.* at 10).

Stevenson subsequently "started getting real mean" with Plaintiff (ECF No. 23-3, at 55), although he continued to treat Stephanie Muir well because "she was more receptive to his sexual comments" (ECF No. 28-8, at 5, 10-11).[5]  For example, Defendant's employee handbook included a policy against the use of cell phones during work hours (ECF No. 29-1, at 14), but Stevenson allowed his store employees to use cell phones for emergency purposes (ECF No. 23-3, at 55).  On September 27, 2007, Plaintiff's mother called the store and asked to speak

_____

[5]  Plaintiff contends that Stevenson learned of her complaints to management around this time because he altered his work hours such that his shift no longer had significant overlap with her own.  (ECF No. 23-3, at 69).

with her about a case of bronchitis that Plaintiff's two-year-old son had contracted; Stevenson answered the phone and hung up on Plaintiff's mother. (*Id.*). Plaintiff's mother then twice called Plaintiff's cell phone, but Plaintiff did not answer. (*Id.* at 56). When Plaintiff's mother called her for the third time, Plaintiff answered the phone, fearing for her son's health, and learned that her son had to go to the emergency room. (*Id.*). Stevenson approached Plaintiff and told her that she could not be on the phone. When Plaintiff attempted to explain the context of the phone call, Stevenson wrote her up and suspended her for one week. (*Id.*; ECF No. 28-5 ¶ 36). Plaintiff and other store employees, including Stephanie Muir, had previously been permitted to take such calls, and Stevenson had never previously disciplined any employee for doing so. (ECF No. 23-3, at 56; ECF No. 28-8, at 10-11).

Plaintiff took the bus home after Stevenson suspended her and, during the bus ride, she called Wanga and left a message about the suspension. (ECF No. 28-8, at 11). She then called Kitty Fields, Defendant's Director of Human Resources, and reported that Stevenson had "sexually harass[ed]" her. (*Id.*). When Fields asked Plaintiff to provide details about the alleged harassment, Plaintiff became hesitant and only described "some of the sexual harassment" to which she had been subjected.

7

(*Id.*).   Fields told Plaintiff that she would investigate her claim; she then asked if Plaintiff would like to speak with Wanga directly about Stevenson's behavior and Plaintiff told her "yes."   (*Id.* at 11-12).   Plaintiff returned to work on October 3, 2007, and met with Wanga to discuss her allegations against Stevenson.   (*Id.* at 12).   When she mentioned that she had obtained an attorney, however, Wanga terminated the meeting and instructed Plaintiff to contact Defendant's attorney directly regarding her allegations.   (*Id.*).

During the week of October 3, 2007, Stevenson wrote Plaintiff up based on a customer complaint and instructed her to lift boxes so heavy that she injured her back and had to miss the next three days of work.   (ECF No. 23-3, at 67; ECF No. 28-8, at 13).[6]   Stevenson had never previously written up employees based on customer complaints and had never assigned Plaintiff to perform such heavy lifting.   (ECF No. 28-8, at 13).

Plaintiff arrived at work on October 16, 2007, for a meeting, and Stevenson asked to speak with her privately following the meeting.   He showed Plaintiff a video in which she had removed money from the cash register, then stated "[a]nd

_____

[6] According to Plaintiff, the customer complained after Plaintiff had ordered him to leave the store for trying to conduct a scam involving cigarettes and for cursing at her. (ECF No. 23-3, at 63).

that's why you're fired" before laughing at her.   (ECF No. 23-3, at 99).   Plaintiff told Stevenson that she was merely making change for the weekend manager for a work-related purpose, which employees were permitted to do, and urged Stevenson to contact the weekend manager to verify her story.   (*Id.*).   Stevenson then told Plaintiff to "[h]old on" while he looked through additional video camera footage before stopping on footage that showed Plaintiff closing the store early.   (*Id.*).   Stevenson asked Plaintiff if she had closed the store, and she stated that she had done so for only 10-15 minutes and only for safety reasons. (*Id.* at 100).   Despite this explanation, Stevenson told Plaintiff that he was firing her for closing the store, and he again began to laugh at her.   (*Id.*).   Plaintiff maintains that there was no company policy preventing store closures in such circumstances.   (*Id.*).   Stevenson then had two police officers escort Plaintiff from the store.   (ECF No. 23-3, at 101).[7]   As she was being escorted out, Plaintiff turned to Stevenson and asked loudly, "Oh, because I'm not willing to have sex with you like Stephanie, I'm going to get fired?"   (*Id.*).   Stevenson did not respond.   (*Id.*).

---

[7] On the same day, Stevenson suspended Takeyia Singletary, another store employee, for purportedly telling someone that he was engaging in a sexual relationship with Stephanie Muir.   (ECF No. 28-18).

The following day, Plaintiff went to Defendant's main office to report Stevenson's behavior and her subsequent termination. (ECF No. 28-4, at 104). At this meeting, an employee asked Plaintiff whether she would accept a similar position at another of Defendant's stores, and she unequivocally answered in the affirmative. (*Id.*). "Nobody []ever called [her] after that" conversation. (*Id.*). To make up for the income that she lost as a result of her termination, Plaintiff began working more frequently as an exotic dancer. (ECF No. 28-8, at 21-22).

**B.    Procedural Background**

Plaintiff filed an intake questionnaire with the Equal Employment Opportunity Commission ("EEOC") on January 23, 2008. (ECF No. 28-11). In that questionnaire, Plaintiff alleged that she had suffered discrimination on the basis of sex due to the "sexual harassment" to which Stevenson had subjected her. (*Id.*). She also alleged retaliation. (*Id.*). At the time that Plaintiff completed this questionnaire, the EEOC counselor informed her that she "did not have to do anything until [she] heard further from the EEOC and that the Intake form would be enough to preserve [her] discrimination claim against Royal Farms." (ECF No. 28-5 ¶ 44). The EEOC subsequently contacted Plaintiff in early October 2008, and Plaintiff filed her formal

charge of discrimination on or about October 8, 2008. (*Id.* ¶ 48). The EEOC sent notice of this charge to Defendant on October 9, 2008 (*id.*), and issued Plaintiff a right-to-sue letter on February 23, 2010 (ECF No. 28-12).

Plaintiff commenced the present action in the Circuit Court for Prince George's County on May 20, 2010, alleging sexual harassment in violation of federal law and related state law claims for assault, battery, false imprisonment, intentional infliction of emotional distress, and negligent training, retention, and supervision. (ECF No. 2).[8] Defendant removed the case to federal court and answered Plaintiff's complaint. (ECF Nos. 1, 5). Plaintiff subsequently moved to remand the case to state court (ECF No. 10), and this motion was denied on October 18, 2010 (ECF No. 15). A scheduling order was issued on the same day. (ECF No. 16). Following the close of discovery, Defendant moved for summary judgment on all counts. (ECF No. 23). Plaintiff opposed this motion on September 1, 2011, and Defendant filed a reply on September 19, 2011.

## II. Standard of Review

A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is

---

[8] Although Plaintiff alleged retaliation in her charge of discrimination with the EEOC, she does not appear to raise this claim in her complaint.

entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted). At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

## III. Analysis

Defendant presents the following arguments in its motion for summary judgment: (1) that Plaintiff's sexual harassment claim must fail because Defendant did not receive timely notice about the filing of the intake questionnaire or, alternatively, because Plaintiff cannot set forth a *prima facie* case; (2) that Plaintiff's state law claims for assault, battery, false imprisonment, and intentional infliction of emotional distress must fail because Stevenson was not acting in the scope of his employment when those claims arose; (3) that Plaintiff's claims for intentional infliction of emotional distress and negligent training, retention, and supervision must fail because they do not state claims for which relief could be granted; and (4) that Plaintiff's negligence claims are preempted by Title VII. These arguments will be addressed in turn.

### A. Summary Judgment in Defendant's Favor Is Not Warranted on Plaintiff's Sexual Harassment Claim

Plaintiff's complaint asserts a claim for sexual harassment under both the *quid pro quo* and hostile work environment theories. Defendant begins by arguing that this claim is barred because Defendant did not receive timely notice of the intake questionnaire that Plaintiff filed with the EEOC. To the extent that this argument is unsuccessful, Defendant further argues that Plaintiff cannot set forth a *prima facie* case because

13

Stevenson's "unwanted" conduct did not occur based on Plaintiff's gender.

### 1.   Timely Notice of EEOC Intake Questionnaire

Defendant concedes that the intake questionnaire Plaintiff filed with the EEOC on January 23, 2008, constitutes a charge of discrimination. (ECF No. 29, at 2).[9] Because it did not receive notice of this filing from the EEOC until approximately October 9, 2008, however, Defendant contends that Plaintiff's sexual harassment claim cannot proceed.[10] This argument ignores long-settled law in this circuit and misconstrues the language contained in Plaintiff's intake questionnaire, and it must fail as a result.

Defendant cites two subsections of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, when contending that Plaintiff is responsible for the lack of

_____

[9] In the memorandum accompanying its motion for summary judgment, Defendant initially argued that this questionnaire may not constitute a charge of discrimination, thus rendering Plaintiff's claim untimely because she did not file her formal charge of discrimination with the EEOC until more than 300 days after Stevenson terminated her. (ECF No. 23-2, at 14). Defendant, however, abandoned this argument in its reply, stating that "there is no disagreement" regarding whether the intake questionnaire constitutes a charge of discrimination. (ECF No. 29, at 2).

[10] Nowhere does Defendant contend that it suffered prejudice as a result of not receiving this notice until approximately October 9, 2008.

timely notice to Defendant regarding the filing of its intake questionnaire.  Those subsections provide as follows:

> (b) Whenever a charge is filed by or on behalf of a person claiming to be aggrieved, . . . *the Commission shall serve a notice of the charge* (including the date, place and circumstances of the alleged unlawful employment practice) *on such employer* . . . within ten days, and shall make an investigation thereof. . . .
>
> (e)(1) A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and *notice of the charge* (including the date, place and circumstances of the alleged unlawful employment practice) *shall be served upon the person against whom such charge is made* within ten days thereafter.

42 U.S.C. § 2000e-5(b), (e)(1) (emphases added).[11]  The United States Court of Appeals for the Fourth Circuit has long construed this statutory language to indicate that "the plaintiff is not responsible for [the] EEOC's failure to notify [an employer] of the charges within [the requisite time period]."  *Waiters v. Robert Bosch Corp.*, 683 F.2d 89, 92 (4th Cir. 1982); *see also Edelman v. Lynchburg Coll.*, 300 F.3d 400, 404 (4th Cir. 2002) ("Once a valid charge has been filed, a simple failure by the EEOC to fulfill its statutory duties

---

[11] A later portion of 42 U.S.C. § 2000e-5(e)(1) extends the time period for filing the charge of discrimination to 300 days under certain circumstances and in certain jurisdictions, such as Maryland.

regarding the charge does not preclude a plaintiff's Title VII claim." (citing *Waiters*, 683 at 92)).[12]

Although Defendant cites that language from *Edelman* verbatim in its memorandum, it ignores this principle entirely. Defendant instead focuses on the facts of *Edelman* in an attempt to demonstrate that the intake questionnaire placed an affirmative duty on Plaintiff to follow up with the EEOC – and that her failure to do so renders her responsible for the purported lack of timely notice to Defendant about her claim. In *Edelman*, the EEOC had written to the plaintiff on December 3, 1997, informing him that the initial information that he had submitted was insufficient for the EEOC to investigate his claim and requesting that he arrange an interview.  300 F.3d at 403.

---

[12] It is not certain that the EEOC's failure to send Defendant notice of the intake questionnaire actually violated these statutory duties at all.  *See Valderrama v. Honeywell Tech. Solutions, Inc.*, 473 F.Supp.2d 658, 663 (D.Md. 2007) (suggesting that the intake questionnaire, which serves to provide "'pre-charge filing counseling,'" may not trigger the EEOC's statutory duty to notify an employer about the complainant's potential claims because the questionnaire itself does not constitute a charge of discrimination), *aff'd*, 267 F.App'x 256 (4th Cir. 2008), *cert. denied*, 555 U.S. 979 (2008). Here, however, Defendant has conceded that the intake questionnaire constitutes a charge of discrimination, contending only that Plaintiff's sexual harassment claim should be barred because the EEOC did not provide it with notice of her claim until October 2008.  The parties agree that the delayed notice was a violation of the statutory duties imposed on the EEOC, and for purposes of resolving the pending motion, the court will accept this unchallenged assumption.

16

In its letter, the EEOC expressly warned the plaintiff that it would assume that he did not intend to file a charge of discrimination if the plaintiff did not respond within thirty days. The plaintiff contacted the EEOC "'[s]oon after' receiving its letter, but '[d]ue to the EEOC's delays,'" an interview was not conducted until March 3, 1998." *Id.* The Fourth Circuit rejected the argument that the plaintiff's claim should be dismissed due to this delay, reasoning that the deficiencies in *Edelman* were instead "failures of the EEOC to carry out its responsibilities under Title VII." *Id.* at 405.

Defendant attempts both to analogize the EEOC letter in *Edelman* to language in the intake questionnaire, which would have required Plaintiff to follow up with the EEOC to preserve her rights, and to distinguish the outcome in *Edelman* because Plaintiff did not do so. This effort is not persuasive. The intake questionnaire completed by Plaintiff contained the following statement: "If you have not heard from an EEOC office within 30 days of mailing this form, please call [the] toll-free number shown on the letter accompanying this form." (ECF No. 28-11, at 4). Contrary to Defendant's assertion and unlike in *Edelman*, where the EEOC's letter unambiguously required the plaintiff to act in order to preserve his rights, the statement here is most plausibly construed as one providing complainants

17

with an *optional*, rather than *mandatory*, avenue to follow up about the status of their complaints.   This conclusion is bolstered by the EEOC counselor's verbal statement to Plaintiff at the time she submitted her intake questionnaire, which expressly noted that Plaintiff did not need to take any additional action to preserve her rights until the EEOC contacted her.   Therefore, Plaintiff had no affirmative duty to contact the EEOC within thirty days of submitting this questionnaire.   The fact that Defendant did not receive notice of her administrative complaint until approximately October 9, 2008 is, at most, a failure by the EEOC to fulfill its statutory duties, and this alleged failure does not, by itself, preclude Plaintiff from proceeding with her sexual harassment claim.

**2.   Failure to Set Forth a *Prima Facie* Case for Sexual Harassment**

Defendant next argues that Plaintiff cannot succeed in presenting a *prima facie* case of sexual harassment, under either the *quid pro quo* or the hostile environment theory, because Stevenson's "alleged conduct was predicated [not] upon her gender," but upon her employment as an exotic dancer.   (ECF No. 23-2, at 18).   This argument, particularly when viewing the facts in the light most favorable to Plaintiff, the nonmoving party, is easily dismissed.

Both theories of sexual harassment require the plaintiff to demonstrate that the harassing conduct resulted because of her sex. *Compare Spencer v. Gen. Elec.*, 894 F.2d 651, 658 (4th Cir. 1990) (noting that a plaintiff must establish the following elements to set forth a *prima facie* case for *quid pro quo* sexual harassment: (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) her reaction to the harassment affected tangible aspects of compensation, terms, conditions, or privileges of employment; and (5) the employer knew or should have known of the harassment and took no effective remedial action), *overruled on other grounds by Farrar v. Hobby*, 506 U.S. 103 (1992), *with Smith v. First Union Nat'l Bank*, 202 F.3d 234, 241-42 (4th Cir. 2000) (explaining that a plaintiff bringing a sexual harassment suit under the hostile environment theory must demonstrate that: (1) she was subjected to unwelcome conduct; (2) the unwelcome conduct was based on sex; (3) the conduct was sufficiently pervasive or severe to alter the conditions of employment and create a hostile work environment; and (4) some basis exists for imputing liability to the employer). To support its argument that Stevenson's comments occurred because of Plaintiff's part-time employment as an exotic dancer, rather than because of sex, Defendant

repeatedly asserts that Stevenson's "unwanted" conduct did not begin until after Plaintiff had started working as an exotic dancer.   In resolving a motion for summary judgment, however, the facts must be viewed in the light most favorable to Plaintiff, the nonmoving party, and Plaintiff has presented evidence that Stevenson's offensive conduct began weeks before Plaintiff started that job.   Therefore, the question is whether, when viewing the facts in this light, a reasonable jury could find that Plaintiff suffered harassment because of her sex.

"An employee is harassed or otherwise discriminated against because of . . . her gender if, but for the employee's gender, . . . she would not have been the victim of the discrimination." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 331 (4th Cir. 2011) (internal quotation marks omitted).   To make this showing, a plaintiff may demonstrate that she faced sexual advances and propositions, whether overt or implicit.   *See Lewis v. Forest Pharms., Inc.*, 217 F.Supp.2d 638, 647 (D.Md. 2002) (explaining that "[s]exual advances need not explicitly request sex" and concluding that a male supervisor's leering at the female plaintiff and touching of her thigh, while making sexually-charged comments, constituted an implicit sexual proposition).

In addition, a female plaintiff may show that the harassing party employed such "sex-specific and derogatory terms" as to

20

make clear that he intended to demean women. *EEOC v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 327 (4th Cir. 2010) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Where male employees have referred to women in degrading language, openly commented on female body parts, and questioned a female employee's sexual activities and experiences, the Fourth Circuit has frequently found that unwelcome conduct occurred "because of [the plaintiff's] sex." *Id.* (finding that a female plaintiff had demonstrated that she faced unwelcome conduct based on sex where her male supervisor used the term "slut" to refer to women, talked about female body parts in graphic terms, asked if the plaintiff "had a better libido" after giving birth, and "opined that she was probably a 'wild thing' in bed"); *see also EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009) (concluding that a reasonable jury could find that the female plaintiff had suffered harassment on the basis of sex after male co-workers repeatedly used the word "bitch" when referring to women); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 691, 695-96 (4th Cir. 2007) (holding that a male soccer coach's frequent comments about players' bodies, such as references to their "breasts 'bouncing,'" along with crude questions about their sex lives demonstrated that the remarks occurred "because [the players] were women"), *cert.*

*denied*, 552 U.S. 887 (2007)[13]; *EEOC v. R&R Ventures*, 244 F.3d 334, 338-39 (4th Cir. 2001) (rejecting the argument that a male supervisor did not harass young, female employees on the basis of sex where the supervisor leered at the women's bodies and inquired about the size of their pants, breasts, and buttocks).

These cases make clear that Stevenson's alleged conduct toward Plaintiff likely occurred "because of [her] sex," and Defendant's argument to the contrary strains credulity.   As an initial matter, Stevenson made overt and implicit sexual advances toward Plaintiff - leering at her breasts and buttocks, frequently touching her in unnecessary ways when making "offensive" comments, and even once trying to kiss her.   He also asked her, in Defendant's own words, whether "she would perform sexual favors for him and his friends" if he visited her at the club.   (ECF No. 29, at 5).   Additionally, Stevenson's comments to Plaintiff beginning in early July 2007 are replete with "sex-specific and derogatory terms" indicating that he intended to demean women.   First, Plaintiff alleges that Stevenson regularly

---

[13] Although *Jennings* involved a sexual harassment claim brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.*, such a claim requires a showing that the harassment was based on sex, and the Fourth Circuit looked expressly to case law interpreting Title VII "for guidance in evaluating [the plaintiff's] claim."   *Id.* at 695.

talked about women in degrading language, referring to them as "ghetto trash" and "bitches."   Second, Stevenson's remarks to Plaintiff included overt comments about female body parts, with Stevenson repeatedly discussing the way that Plaintiff's clothing fit over her breasts and buttocks, and asking about whether she exposed her vagina during her employment as an exotic dancer.   Third, Stevenson asked vulgar questions about Plaintiff's sexual activity, including masturbation and oral sex, both at and away from the club where she worked as an exotic dancer.   From these facts, taken as a whole, a reasonable jury could well find that Stevenson's harassment of Plaintiff occurred because Plaintiff is a woman.[14]

Defendant presents no other argument when contending that Plaintiff cannot set forth a *prima facie* case for sexual harassment, and its motion for summary judgment on this ground will therefore be denied.[15]

---

[14] Indeed, when viewing the totality of Stevenson's alleged conduct, it is unlikely that Defendant could obtain summary judgment on this issue even if Plaintiff had worked as an exotic dancer before the unwelcome conduct began.   *Cf. Dreshman v. Henry Clay Villa*, 733 F.Supp.2d 597, 612 (W.D.Pa. 2010) (concluding that a reasonable jury could find that a male nurse had suffered harassment on the basis of sex when his female co-workers repeatedly commented on his former employment as a stripper and his physical appearance, in addition to stating that "men should not be nurses").

**B.   Summary Judgment in Defendant's Favor Is Warranted on Plaintiff's Claims for Assault, Battery, False Imprisonment, and Intentional Infliction of Emotional Distress Because Stevenson Was Not Acting in the Scope of Employment When Those Claims Arose**

Stemming from the sexual harassment that she purportedly suffered due to Stevenson's conduct, Plaintiff brings claims for assault, battery, false imprisonment, and intentional infliction of emotional distress against Defendant.   Defendant maintains that these claims cannot proceed because, as a matter of law, Stevenson was not acting in the scope of his employment when he engaged in the conduct giving rise to these claims.   For

---

[15] In its reply, Defendant attempts to analogize to *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428 (7th Cir. 1995) (Posner, J.), to support its argument that Stevenson's conduct did not occur because of Plaintiff's sex. In *Baskerville*, Judge Posner concluded that a handful of statements made by a male supervisor to a female employee over a seven-month period did not establish a claim for sexual harassment. Defendant cites these comments, which described the plaintiff as a "pretty girl" and "hot," and the supervisor's singular reference to masturbation as support for its argument that the facts of the present action do not show that Plaintiff faced unwelcome conduct on the basis of sex. This analogy is unpersuasive for two reasons. First, the nature of the supervisor's comments in *Baskerville* differs dramatically from those at issue in the present action. While the *Baskerville* supervisor made isolated and general references to the plaintiff's appearance, Stevenson allegedly commented on Plaintiff's private body parts on a daily basis. Second, the *Baskerville* holding rested, in important part, on the infrequency of the supervisor's offensive comments, an issue which goes to the severity and pervasiveness of the harassment and is not presented for resolution in Defendant's motion for summary judgment.

purposes of resolving the pending motion, the parties agree that no material facts are in dispute.

The Court of Appeals of Maryland has described the issue of scope of employment as follows:

> To be within the scope of the employment the conduct must be of the kind the servant is employed to perform and must [be] . . . actuated at least in part by a purpose to serve the master. . . . [W]here an employee's actions are personal, or where they represent a departure from the purpose of furthering the employer's business, or where the employee is acting to protect his own interests, even if during normal duty hours and at an authorized locality, the employee's actions are outside the scope of his employment.

*Sawyer v. Humphries*, 322 Md. 247, 255-57 (1991). The Court of Special Appeals of Maryland applied these principles in *Tall* ex rel. *Tall v. Bd. of Sch. Comm'rs of Balt. Cnty.*, 120 Md.App. 236, 254 (1998), a case in which parents brought suit against a school board for injuries that their mentally handicapped son had suffered when his special education teacher beat his arms and legs with a ruler after the child urinated in his pants. The parents contended that the teacher had acted within the scope of employment because some physical interaction between the child and the teacher, including "disciplining [the child] if [he] misbehaved or failed to listen," "was foreseeable" due to the child's disability. *Tall*, 120 Md.App. at 248. The *Tall*

court rejected this argument. Reviewing factually analogous cases from several other jurisdictions, the court found two considerations persuasive when concluding that the teacher had not acted in the scope of employment when beating the child. *Id.* at 258-60. First, the school board had a written policy prohibiting corporal punishment in any form. Second, although legitimate physical interactions between a teacher and mentally handicapped student may "be appropriate in certain situations, [those legitimate interactions] in no way constitute[] implied authority for a teacher to beat a mentally disabled child" in order to discipline him. *Id.* at 259. Indeed, the *Tall* court could identify no manner in which the act of beating a mentally disabled child could further the school board's objective of educating children, and it thereby refused to hold the school board vicariously liable for the teacher's actions. *Id.* at 260.

Judges in this district have since applied the *Tall* court's reasoning in numerous actions involving sexual harassment in the workplace. Those cases have repeatedly held that, under Maryland law, an employer is not vicariously liable for torts arising from sexual harassment by another employee because those torts arose outside of the scope of employment. *See, e.g.*, *Davidson-Nadwodny v. Wal-Mart Assocs., Inc.*, No. CCB-07-2595, 2010 WL 1328572, at *9 (D.Md. Mar. 26, 2010) (declining to

permit the plaintiff's battery claim to proceed against her employer "[g]iven that [the female supervisor's] alleged harassment and assault of the plaintiff . . . were outside the scope of her employment"); *Perry v. FTData, Inc.*, 198 F.Supp.2d 699, 709, (D.Md. 2002) (refusing to hold an employer vicariously liable for assault and false imprisonment where those torts stemmed from a male supervisor's sexual harassment of a female employee); *Thomas v. Bet Sound-Stage Rest./BrettCo, Inc.*, 61 F.Supp.2d 448, 454-55 (D.Md. 1999) (concluding that a plaintiff could not hold an employer vicariously liable for assault and battery where those claims arose from a male supervisor's purported sexual harassment of the female plaintiff). Notably, in reaching this conclusion, these cases have emphasized that an employee does not act in the scope of employment when he engages in conduct for personal reasons and without any purpose of furthering the employer's business. *See, e.g.*, *Perry*, 198 F.Supp.2d at 708-09.

Here, Plaintiff makes much of the fact that Stevenson served as her supervisor and allegedly harassed her during business hours while performing company-authorized supervisory functions, but this contention misunderstands the test for scope of employment. In order to hold Defendant vicariously liable for Stevenson's purportedly tortious conduct, Plaintiff must

demonstrate that those tortious actions occurred, at least in part, to further Defendant's business purposes.   Nowhere does Plaintiff make such an allegation.   Indeed, Defendant's written policy prohibiting sexual harassment in the workplace strongly supports the conclusion that the harassment Plaintiff allegedly suffered did not further any of Defendant's business purposes. Therefore, while certain workplace interactions between Stevenson and Plaintiff "may [have been] appropriate," and thus within the scope of employment, those interactions "in no way constitute[d] implied authority" for Stevenson to harass Plaintiff sexually.   *Tall*, 120 Md.App. at 260.   Accordingly, Plaintiff's attempt to hold Defendant vicariously liable for these various torts must fail, and summary judgment will be granted in Defendant's favor on these counts.

   C.   **Summary Judgment in Defendant's Favor is Warranted on Plaintiff's Claim for Negligent Training, Retention, and Supervision Because This Claim Is Preempted by Title VII**

   Plaintiff's final claim against Defendant is for negligent training, retention, and supervision, and Defendant's arguments as to this claim can be easily resolved.   Defendant sets forth two arguments as to why summary judgment in its favor is warranted on this claim:   (1) the claim is preempted by Title VII to the extent it arises from Defendant's failure to prevent and address the sexual harassment that Plaintiff allegedly

28

experienced; and, (2) Plaintiff has not presented facts to support a negligence claim on any other basis.[16]   The former argument is dispositive in this case.

In her complaint, Plaintiff expressly bases the claim for negligent training, retention, and supervision solely on Defendant's purported failure "to effectively train all employees to report instances of sexual harassment . . . in the workplace," "to take action to affirmatively discover the occurrence of sexual harassment in the workplace," and "to take corrective action against Stevenson to reasonabl[y] assure that he did not sexually harass other employees again." (ECF No. 1 ¶ 50).   It is well-established that Title VII preempts negligent training, retention, and supervision claims when they arise from allegations of sexual harassment.   *See Perry*, 198 F.Supp.2d at 707-08 ("The rationale for this preemption is that [Title VII is] meant to provide remedial measures for violations of the public policy condemning sexual harassment."); *Crosten v. Kamauf*, 932 F.Supp. 676, 684 (D.Md. 1996) ("If [the negligence counts] do no more than attempt to impose liability on [the defendant] for its alleged failure to conform to the dictates of Title VII in its efforts to prevent sexual harassment, or to

---

[16] Plaintiff did not respond to either argument in her opposition.

properly respond to a report of sexual harassment, [those counts] merely restate the claim brought under Title VII."). Because Plaintiff bases this negligence claim solely on Defendant's failure to prevent Stevenson's harassing conduct and to respond adequately thereto, it is preempted by Title VII and cannot proceed. Summary judgment will be granted in Defendant's favor on this count.

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment will be granted in part and denied in part. A separate Order will follow.

<u>                    /s/                    </u>
DEBORAH K. CHASANOW
United States District Judge